Case number 16-7081. John Doe, also known as Gedang, Appellant v. Federal Democratic Republic of Ethiopia. Mr. Martinez for the Appellant. Mr. Snyder for the Appellee. Mr. Martinez, good morning. Good morning, Your Honor. And good morning, Your Honors. May it please the Court. With the Court's permission, I'd like to reserve three minutes of my time for rebuttal. This case presents a question of first impression, whether Americans may avail themselves of their own courts when a foreign state invades a citizen's privacy by installing spyware on that citizen's computer and thereby intercepting electronic communications occurring within the United States. The alternative proposed by Ethiopia in this case is to adopt a rule that would permit foreign states to spy on Americans at will, commit torts within the United States with impunity. Isn't it a jurisdictional question? You seem to be jumping to merits, but isn't the question here whether, in light of the FSA, whether this is within our jurisdiction? Certainly, Your Honor, that is the first question. I will indeed be looking at that. That's where you lost the other one. Yes, Your Honor. The District Court here erred in two ways. First, the Court erred in finding that the Foreign Sovereign's Immunity Act, specifically the noncommercial tort exception of 28 U.S.C. 1605-85, did not apply to domestic interception and intrusion upon seclusion of a U.S. citizen's computer that was used at all times in Maryland. Second, the District Court committed error in holding that the Wiretap Act does not provide a civil remedy against a foreign state that, through its persons, wiretapped Mr. Kadain's computer and intercepted electronic communications within the United States, turning first to the Foreign Sovereign's Immunity Act. The District Court incorrectly concluded that the acts precipitating the tort of the Ethiopian government occurred outside the United States. Why was that finding incorrect? Or why was that conclusion incorrect? Sure, Your Honor. Under the test that has been proud of the entire tort rule in Persinger v. Iran, and most recently addressed by this Court in Jerez v. Cuba, the test has been articulated, the entire tort, as reflected when the precipitating act and the injury both occur in the United States. Here, the injury, the invasion of privacy, and the emotional harm attendant to it, were precipitated by the acts. The acts that precipitated that injury were specifically the interception, the wiretap that occurred, and the intrusion, both of which occurred on a U.S. computer 27 miles from this courthouse within the United States. But it didn't just magically appear on the computer, right? Some action had to be taken to put it on that computer. Yes, Your Honor. An email was sent and ultimately received in the United States by Mr. Khadain, and then the act of clicking on an attachment, a Word document that was in the email, which is designed by the software that's used in this case, the FinSpy software, is designed to then install a piece of spyware on the target computer, thereby taking the computer over. The act of installation occurred in the United States, as well as the subsequent interception. So if this had been, let's just say, an old-fashioned letter bomb that had been mailed from Ethiopia, and then when it was opened by Khadain, he was injured by it, you're saying that all of the acts would have occurred in the United States if those had been the facts? I would say that all of the precipitating acts, the appearance of the bomb in the United States, and its subsequent detonation, of course, and there's no precipitating acts of the injury. So the mailing in Ethiopia would have no legal relevance under tort law? It would not, Your Honor. Your Honor, if you look at cases, there are numerous cases within this district that have dealt with acts taken, considerable acts even, taken outside of the United States. For instance, in Letelier v. Chile, and in Liu v. China, where you have political assassinations that occur in the United States, there were considerable actions in planning and plotting and putting the entire assassination... Well, go ahead. Go ahead. Putting aside whether Letelier is still good law, there you had an agent of the foreign government physically present in the U.S. committing the tortious act, right? That's right, Your Honor. But what I would point to first on that sub-point is that the interception itself always has to occur by mechanical means. It has to be done by something other than a human. Even an old-fashioned wiretapping of a phone line, it's... You're assuming that's correct. Yes, Your Honor. I don't see how that solves your problem. Do you still have somebody committing the actual acts that constituted the beginning of the torts outside of the United States? Sure, Your Honor. Beyond the example of Letelier, as Judge Wilkins asked me to set aside for a moment, you can also look to the court's opinion in Olsen v. Mexico, where a plane crash, a plane leaving from Mexico, ends up crashing in the United States, killing everyone on board, including two prisoners that are being transported. The claim is that the pilot was not properly trained in Mexico, and the training was faulty, and the plane wasn't properly maintained. All of that occurring in Mexico. Notwithstanding those actions, the sovereign was not immune in that case. And I think in this case, you have software that is acting out, carrying out, it is programmed to take the step... I wouldn't accept that, Your Honor, respectfully. You wouldn't? I would not. I would accept it, but it's proven. Well... Nobody came over here and started the computer process that constituted the ending of the torts. They did it in Ethiopia, right? Well, respectfully, Your Honor, the code never gets installed until it reaches the United States and is clicked on, and then installed. It's installed here. How did it get in a position to be installed? By being emailed into the country. From where? We're not certain. We believe it's from overseas. No, it was certainly not from within the United States. That's right. That's right. The interception, Your Honor... Whoever did something, whatever the human did, the human did it somewhere outside the United States. Sure, just the same as humans did very significant things in Olson, and in LaToya, and in Loo. In each of those, the humans did the actual commission of the tort, whether it was a negligent flying of the plane, or whether it was the willful act. They did it within the United States. Your Honor, the ditting and the verb in that sentence, I'd submit that Ethiopia had a machine do its dirty work. It programmed a computer that it took over in the United States to do its dirty work. I will accept the court's premise that there's some action of sending that here, but the actual dirty work, the computer replaced the lineman that went and put the clips on the, to use the old-fashioned analogy, to wiretapping. The computer ran on the machine here in the United States, in Maryland. That's how it works. We know that because it is a commercially available piece of software sold only to governments. The documentation for it is available. It has to be licensed, and they pay to use it. So your argument seems to be that the computer program was, in effect, an agent of Ethiopia. So in that sense, it's like the Ninth Circuit case where, was that Liu? The Ninth Circuit case where it was the assassin from China performs the assassination, and they're an agent of China. Correct, Judge Wilkins. The software acts out the intent. It carries out the mission, or acts in the agent. The same would be true, Your Honor, if you decided to operate a drone from across the border in Detroit, and you were in Windsor, Ontario, and decided to send a drone into the United States that was programmed to carry out certain tasks in the United States. How is this different, though, from injecting the hepatitis virus into the Cuban refugee in Cuba? He's injured in America, and yet we said it's not occurring entirely in the U.S. Yes, Your Honor. The Jerez case, and in the contrast to the hypothetical in Jerez, the court in Jerez, which clearly said, game over, the injury and the act precipitating it both occurred in Cuba. There, a Cuban prisoner- No, I said- I'm sorry? We said the injury occurred in the U.S. Well, no. The court said that the gentleman had been infected with hepatitis in Cuba, and then, of course, contracted hepatitis in Cuba. Those two things, getting the disease, the virus, would be the injury, and the act precipitating it would be the infection, the injection with the virus. In contrast to that, the mailing of the virus into the United States through the mails, which is analogous to sending a virus through the e-mails, is one that, when it reached- the court was hypothesizing if that individual had been in the United States when the package arrived, in that case, that entire tort would occur here. He would be injured here. He would be infected with the virus, which would be the precipitating act, and the injury would be contracting the disease. In looking at that analogy, the court was grappling with the argument that the prisoner had made. He contracted hepatitis long before while a prisoner in Cuba, and he tried to argue that, never minding that he was infected and injured in Cuba, when he comes to the United States many years later, he still has the virus replicating within his system. So his theory of the case was the entire tort to be said to occur here because the infection was growing every day. Every day he was being-he was suffering the infection. The infection was a living organism. Well, I'm reading from the opinion. Judge Williams says the continued replication of hepatitis C and the cirrhosis describe an ongoing injury that he suffers in the United States as a result of the defendant's acts in Cuba. But the law is clear that the entire tort, both the injury and the tort, must occur in the United States. So I read that as saying maybe the initial injury occurred in Cuba, but the ongoing injury in the United States through replication is not enough. That's correct, Your Honor, and I'm not-forgive me if I wasn't clear on that. It's clear the court's saying the gentleman infected and injured in Cuba coming here and continuing to suffer doesn't make the sovereign immune, or does make the sovereign immune. Would it have made any difference to your argument if your client had his computer, let's say, in England where this e-mail, I guess, originally went, and they put the thin spy on the computer while it was in England? Yes, Your Honor, it would. And this is not-that's exactly the contrast I would draw, is that this is not a case where Mr. Gaddain traveled to Ethiopia or to England or anywhere else outside of the United States and his computer was infected there and started-so it infected, intercepted, and started to spy, complete tort outside of the United States. Then he travels into the United States. Different story. I would accept that. That would be Jerez. Here, in stark contrast to that, Your Honor, and if I'm-I've gone over my-I'm into my rebuttal time, if I may finish. The-here, in contrast, the code gets installed in the United States, not Ethiopia, and begins to intercept in the United States, not Ethiopia, and then records conversations of an individual and his entire family all here within Maryland. If those actions, Your Honor, had taken place from a-the actions we're pointing to as sending the e-mail, if the e-mail had been sent from a Starbucks outside this courthouse in Washington, D.C., over into Maryland, we would still say that the interception under the wiretap act occurred in Ethiopia-I'm sorry, in the U.S., in Maryland. We'd still conclude that the intrusion occurred in Maryland. Thank you, Your Honors. Okay. I do have one question. No. Before you have some time remaining. Anyway, if we approach-if we decide the jurisdictional issue first, unlike the district court, do we even have to reach the wiretap act? I mean, if we decide the jurisdictional issue against you. Well, we think there's enough of a record that we could, assuming the court remanded for the district court to consider whether the wiretap act applies. Otherwise, I think you do need to reach the wiretap act. All right. If we decide against your jurisdiction, why would we need to reach the wiretap act? You would not at that point. Okay. Thank you. Thank you. Mr. Snyder. May it please the Court, good morning, Your Honors. Tom Snyder here on behalf of the Federal Democratic Republic of Ethiopia. With me is Mr. Bob Charo. Your Honors, I want to emphasize that machines do not act. Actors act. People act. And all of the precipitating acts alleged in the complaint here occurred in Ethiopia, occurred outside the United States. The allegation is that the Ethiopian government, through its agents in Ethiopia, deployed an email containing the spyware. That email was deployed based on the allegations first to London, where an intervening actor then forwarded the email to the plaintiff here in the United States. All of the acts, all of the bodily movements, all of the physical manifestations of the Ethiopian government's will occurred in Ethiopia, outside the United States. But the complaint, which we have to assume its allegations are true for these purposes, says that the program was self-executed, that the Ethiopian government didn't have to take any, you know, specific actions once the attachment was open for the program to download and to begin its work. So in that sense, it didn't take acts by the Ethiopian government in Ethiopia for the intrusion to manifest itself, if we take the complaint as true, right? I would say it did, right, because the act was deciding what type, as alleged, deciding what type of computer spyware to use, and the fact that it was automated, right? It had to be attached to the email in Ethiopia. It had to be transmitted from Ethiopia. It had to be programmed to be automated in Ethiopia before it left. Again, machines don't act. Computer software doesn't act. Everything that occurred after the act of deploying the email was a causal effect of the act that occurred in Ethiopia. Is the act the deciding, or is the act the doing of what's been decided? You stated the act was the deciding what spyware to use. I would understand it to be the act was the using of the spyware. I'm sorry, Your Honor. You said, I think you said, the act was deciding what spyware to use. I question whether that is correct. I'm asking you, wasn't the act the using of the spyware, not the deciding? It would be the using and the deployment of the software. Right, exactly. Correct. And that act of deploying the software resulted in a series of causal effects that ultimately resulted in the injury to the plaintiff. It could not be said that the entire tort was committed within the United States. Correct. I want to just briefly contrast the tort exception, 1605A5, with the commercial activity exception to the FSIA in 1605A2. 1605A2 has three prongs to it. The third prong provides jurisdiction in U.S. courts for actions based upon an act outside the territory of the United States in connection with the commercial activity of the foreign state elsewhere, and that act causes a direct effect in the United States. If we were proceeding under the commercial activity exception, which we're not, that would bring it closer to the facts alleged in this case. Our position would be that the direct effects prongs still wouldn't be met because the direct effect would have occurred in London. That's where the email was initially targeted. It would be more of an indirect effect in the United States. But in any event, that direct effect prong is not in the tort exception to immunity. Congress decided it wanted to keep the tort exception to immunity very narrow, and when it wants to open up the exception for personal injury, it knows how to do so. It did so just last year in the Justice Against Sponsors of Terrorism Act where Congress implemented a new exception to immunity for personal injury caused by international acts of terrorism in the United States and an act of a foreign state regardless of where that act occurs. So in that specific situation, Congress saw it necessary to open up the exception a bit for personal injury in the terrorism context. So if they want to do that. So let's suppose Ethiopia, to harass Khadani or Khadang, controlled a drone or a self-driving car, really, and caused that car to follow him or crash into his car or the drone to follow him, harass him, and they were controlling that from Ethiopia. Wouldn't that tort be entirely inside the U.S.? No, it would be the same analysis. The act of controlling the drone or the car was done outside the United States. So under the entire tort rule, the criteria would not be met. Well, the machine that is doing the dirty deed, so to speak, is being controlled in the U.S. So just because a button is being pushed in Ethiopia, the purpose of pushing that button is to control something in the U.S. I mean, the whole precipitation is intended to be in the U.S. That's right, but still the machine is not acting. The machine is functioning at the behest of acts that are occurring outside the United States. It may be a direct and immediate effect of those acts outside the United States. It may be almost instantaneous, but it is still an effect of an act that occurred outside the United States. So if Ethiopia had one of its agents operating the drone from a house across the street from Kidani or the self-driving car operating, then you would say what would be the result there? There would be an act in the United States. Under this example, the person controlling the drone is located in Silver Spring in Washington, D.C. So there is an act. Then the legal analysis would change and would move to whether the act of that actor can be attributed to the Ethiopian government. You'd have issues of agency or respondeat superior. So the whole thing turns on the fact of physical presence. Yes, Your Honor. So even if technology is to the point where an actor can do the exact same thing without the physical presence or even an intervention of a human being, if they're smart enough to do it that way as opposed to having to use a person physically present to do it, then they escape liability under the statute. Under the law as it stands, they escape liability for private tort action. There are, of course, other means for addressing those scenarios, diplomatic channels, economic and political pressure by the U.S. government, perhaps even criminal prosecutions. But in terms of private tort suits, in that scenario, there would be no jurisdiction under the Foreign Sovereign Immunities Act. So do you think all of the millions of federal employees whose records were hacked by the Chinese government would have no cause of action? If the hacking occurred, if the Chinese did the hacking from outside the United States, there would be no private right of action under the Foreign Sovereign Immunities Act for the U.S. government officials. There would be no private right of action. It's a jurisdictional analysis rather than an elemental analysis of the cause of action. I'm not disagreeing with your result. I'm suggesting that perhaps the terminology rather than saying they have no cause of action would be to borrow a phrase from Plummer and say they have no cause of action within the jurisdiction of the United States. You're exactly right, Your Honor. There would be no subject matter jurisdiction. Any other questions on the entire tort? I want to move for a moment to the discretionary function exemption under the tort exception. Allegedly, and I want to be clear that we're accepting the allegations as made and the complaint is true for purposes of testing the legal sufficiency of the complaint. The Ethiopian government hasn't admitted any of the facts, and if anything I inadvertently suggest they do, that's not the case. The alleged electronic surveillance of foreign nationals outside of a sovereign state is a discretionary function of a state. A state has the choice, has the discretion, has the ability to engage in electronic surveillance abroad. Countries do it. The United States does it. There's been a question, a choice of law question, what law should govern here in terms of the discretion exercised by the, allegedly exercised by the Ethiopian agents. Our position is that the law governing the acts of Ethiopian government officials acting in Ethiopia is Ethiopian law. There have been no allegations made in the complaint that Ethiopian law has been violated, and we're aware of no Ethiopian law that has been violated here. Now, the district court grappled with the point that there could have been U.S. laws violated through this electronic surveillance, and there we would point to this court's decision in the MacArthur case where Peru used a building zoned for residential purposes as its naval attache office. The use of that building may have violated criminal zoning ordinances in the District of Columbia, but this court decided that Peru was engaged in a discretionary function, and even if those criminal ordinances had been violated, that did not... If we decide, if you would have us decide in the FSIA question, we don't have to reach that, right? Well, this is part of the FSIA question, but if you decide on the entire tort... Right. We decide on the entire tort case. You don't have to reach discretionary function... We don't have to reach discretionary function. Or the wiretap, to follow up on the last question asked. Right. To go back for a moment to the entire tort issue... Yes, Your Honor. So let's suppose the facts alleged were that Ethiopia had mailed a present, a stuffed animal to Doe's house, making it look like it was from a friend or a relative, but the stuffed animal actually had a recording device in it that could audio record and video record that as soon as the package was opened, it turned it on and it operated as long as the battery, until the battery died. Same result? From where did Ethiopia mail the alleged package? From Ethiopia. Same result. So even though... I mean, what is the act, the precipitating act there? The precipitating act would be the act of mailing the package. Again, an act is a bodily movement. The model penal code defines it as a bodily movement. The restatement talks about it as a physical act of an actor. If someone shoots someone else, the act is the pulling of the trigger. The movement of the bullet and the impingement upon the person is an effect of that act. So an act really is a bodily movement. It requires an actor. It requires a person. And so that's why there really is a physical presence test in the FSIA, because you have to look at where the actor acted. You have to look at where the bodily movement occurred that had the causal effect of resulting in the tortious injury. So it doesn't matter in your view whether there was something additional that had to be done after the package was received or after, in what's alleged in the complaint, the software was downloaded or the attachment was opened. All of that is really a red herring or beside the point in your view, the only thing that matters is how the software or the package was sent or where it was sent from. Yes. What matters in our view is where the actor acted, where the individual set into motion the causal effects that resulted in the injury. And the automation, the computer programming, doing whatever it did, turning on, communicating with the relay system, that was all automation. Those are all effects. Those are all something done by something that's inanimate, that's not a human. And it really does go back to the deployment of the software. Allegedly, Ethiopia didn't send a random attachment. They sent an attachment that they knew would have these automated functions and would have functionality that resulted in the intended result. So those are all causal effects of the act that occurred allegedly in Ethiopia. Any further questions, Your Honors? All right. Your time is up. Thank you. Thank you. How much time does Mr. Martinez have? Okay, why don't you take two if you need it. Your Honors, there's two central points upon which Ethiopia seems to have rested its argument. One, the proposition that machines do not act. That simply is belied by the facts and the reality of the modern world. Cars drive themselves, and they can be taken over remotely, and they can be programmed from somewhere else to drive off a bridge. ATMs have replaced tellers. Pacemakers can regulate the beat of the heart. These machines certainly are programmed with software to act. The position that Ethiopia is taking here is, simply put, to allow a sovereign to use a machine as attachment. We can envision a scenario where you can just go along the border of the United States, on either border, and send across software agents by any foreign states actor, any diplomat across the border that wants to carry out an act here. There's no question that foreign sovereigns are immune from most of the things that they do. So is it really surprising that the position that the person representing the sovereign is taking is, the sovereign is immune? That doesn't sound exactly shocking, does it, Counselor? No, Your Honor. The general proposition, of course, is accepted and is not shocking. But in point of fact, Congress itself, in establishing the jurisdiction, i.e., carving out the immunity, drew the line of where sovereigns cannot. That line has to be met by an entire court. Right. Right. I'm not sure why your argument would bear much weight by saying, well, if we accept the position of the sovereign, then the sovereign is immune. Well, but it's wrong under the case law of this district, of the circuit, under the entire court rule, because the injury no doubt occurred here, the listening in and the spying and collecting information, and the acts precipitating it, that's the test, occurred here. The computer was intercepted by software, by a machine that was recording. And finally, I'll add, if I might finish the point, Your Honor, there is no physical presence requirement. The other hook to their argument, Congress specifically considered the European Convention, which explicitly included expressly a physical presence, must be present to win, language in the statute. Congress did not do that in the Foreign Sovereign Immunity Act. There's no language in there that says the actor has to be physically present or that a machine can't take its place. Thank you. Well, but when you see from the legislative history, the whole reason this was put in was to be able to sue people, I mean diplomats who were driving drunk here. That certainly requires physical presence. That does. But that wasn't the only limit on the torts. The legislative history, which was laid out very nicely by Judge Bork and the person to her opinion, even in the passage that uses that paradigmatic example of traffic accidents, goes on to say, and other torts. And beyond that, the rest of the history is quite clear. It was not intended to be limited to just one class of torts, and they certainly didn't say that in the statute. All right. Thank you. Thank you, Your Honors.
judges: Henderson, Wilkins, Sentelle